Sharon PRATT, Mother, Michael Nesmith, Sr., Father, Individually and in Their Own Right as Parents and Natural Guardians for Michael Nesmith, Jr., Appellants

v.

ST. CHRISTOPHER'S HOSPITAL, Ronald Souder, M.D., Margaret Fisher, M.D., Covenant House Health Services, Covenant House, Inc., Germantown Hospital Emergency Physician(s) Associates, Inc., Stephen Raphael, M.D. and Nellie Novak, M.D., Appellees.

Appeal of Sharon Pratt and Michael Nesmith, Sr.

Superior Court of Pennsylvania.

Argued Nov. 19, 2002.

Filed April 23, 2003.

Gayle Lewis, Philadelphia, for appellants.

William C. McGovern, Philadelphia, for appellees.

Before: DEL SOLE, P.J., KLEIN and CAVANAUGH, JJ.

DEL SOLE, P.J.

¶ 1 Sharon Pratt and Michael Nesmith, Sr., appeal following the denial of their post-trial motions and the entry of a judgment in favor of Appellees/defendants. Upon review, we remand for further proceedings.

¶ 2 The trial court aptly summarized the factual history of this case as follows:

The child, Michael Nesmith, Jr., ... then six months old, was hospitalized at [defendant] St. Christopher's Hospital on August 10, 1989 due to a high fever and a full fontanelle (a bulging of the anterior of his forehead). A spinal tap, ordered and performed almost immediately after admission, ruled out meningitis. After treating the child for about eight days, a CAT scan was performed which revealed the subdural empyema. Plaintiff maintains that it was negligent [sic] on the part of the defendant physicians (and the hospital as their ostensible agent) not to have diagnosed this condition sooner. As .a result of this failure of diagnosis, plaintiff asserted that the child suffered severe brain damage. The issues of negligence and causation were hotly contested by the defense. The [defendants] maintained that since the spinal tap showed clear spinal fluid, there was no reason to believe that the child suffered from this rare and vicious disease. Defense also asserted that since there was no vomit-

ing, the fontanelle had been flat during the majority of the child's stay at the hospital and he was alert up until shortly before the CAT scan was performed, that there was no reason to believe that he suffered from this disease. The [defendants'] experts maintained that the subdural empyema, which emanated from an e-coli bacteria, is extremely rare. Thus, only after the child became extremely ill and lethargic, on or about the eighth day of hospitalization, it was reasonable and with the standard care to order a CAT scan of the brain. As stated, on August 18, 1989, the test was performed and the disease was detected. Trial Court Opinion, 5/11/01 at 2. As a result of this condition, Michael suffered neurological and physical impairments.

¶ 3 Appellants filed suit in October of 1991. A jury trial was held and resulted in a verdict for Appellees. Appellants filed a motion for post-trial relief. The trial court granted the motion and ordered a new trial. Appellees appealed the ruling, and this Court affirmed.

¶ 4 In January 2001, the second trial commenced. After deliberating approximately eight hours over two days, the jury returned a verdict in favor of the Appellees on February 7, 2001. Following the announcement of the verdict, the jury was polled, indicating that ten jurors had found in favor of the Appellee physicians and two for the Appellants. Appellants did not file post-trial motions.

¶ 5 On or about February 22, 2001, the trial court received a letter from Pamela Toller, one of the jurors in this matter, dated February 14, 2001. In her correspondence, Ms. Toller wrote:

I want to stress that I believe that my fellow jurors worked hard to reach what they believed was the proper verdict, but I think that they relied improperly on information they gathered from sources outside the courtroom to reach the verdict. Beginning during the trial and continuing through deliberations, some of the jurors reported that they had spoken to various people such as relatives and friends involved in the medical profession and their own personal physicians to get their opinions regarding whether a CAT scan should have been performed earlier, whether both a meningitis test and a CAT scan should have been performed at the same time and whether this was the standard of care in 1989. Two of the jurors reported conversations with multiple medical professionals that occurred on the first evening of deliberations. I believe that the opinions these jurors obtained from the outside sources influenced the verdict because the jurors discussed these outside opinions during deliberations and stated that their conversations with medical professionals either confirmed the jurors' own opinions or changed the jurors' minds.

By correspondence dated February 28, 2001, the trial court judge sent copies of the Toller letter to all counsel of record. Appellants' counsel thereafter filed post-trial motions, *nunc pro tunc*. By order dated March 13, 2001, the court permitted the filing of these post-trial motions *nunc pro tunc*, limited solely to the issue involving jury deliberations arising from the Toller letter. Subsequently, Appellants filed an amended motion for an emergency evidentiary hearing and for post-trial relief.

¶ 6 By order dated May 11, 2001, the trial court denied Appellants' motion for a new trial and request for a hearing. Judgment was entered on the verdict in favor of the Appellees. Appellants filed a timely appeal.

¶ 7 On appeal, Appellants present the following issues:

1. Did the trial judge properly allow Appellants' post-trial motions to be filed *nunc pro tunc?*

2. Did the trial judge abuse his discretion in failing to assess the potentially prejudicial effect of the extraneous communications of this case between jurors and their own personal doctors, as well as, their discussions with out-of-court friends and relatives of the medical profession?

3. Since the trial court failed to assess the jurors' out-of-court discussions, and thereby barring any reviewing court's evaluation of such misconduct, is the only remedy a new trial?

4. Was Appellants' right to a fair trial, under due process, violated since the jury's verdict was likely tainted by out-of-court medical opinions?

Appellant's Brief at 4.

¶ 8 With regard to Appellants' first issue, we agree that the trial judge did not abuse his discretion in allowing Appellants' post-trial motions to be filed *nunc pro tunc*. Moreover, Appellees do not argue that the trial judge improperly permitted the Appellants to file post-trial motions *nunc pro tunc* limited to the issue of jury misconduct as alleged by Ms. Toller.

¶ 9 We will address Appellants' remaining issues together, as they address substantively the same question: Whether the trial court abused its discretion in denying Appellants' request for an evidentiary hearing or a new trial based on the allegations of jury misconduct.

¶ 10 We will reverse a trial court's decision to deny a motion for a new trial only if the trial court abused its discretion. *Stalsitz v. Allentown Hosp.*, 814 A.2d 766, 771 (Pa.Super.2002). An abuse of discretion exists when the trial court has rendered a decision or a judgment which is "manifestly unreasonable, arbitrary, or ca-

pricious, has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will." *Stalsitz*, 814 A.2d at 771. This Court may not substitute its judgment for that of the trial court. "A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion." *Slappo v. J's Dev. Assocs. Inc.*, 791 A.2d 409, 414 (Pa.Super.2002). If the record adequately supports the trial court's reasons and factual basis, an abuse of discretion will not be found. *Id.* at 414.

¶ 11 With regard to post-verdict testimony by jurors, the rule in Pennsylvania is that a juror is incompetent to testify about what occurred during deliberations. *Carter v. United States Steel Corp.*, 529 Pa. 409, 604 A.2d 1010, 1013 (1992). This rule is often referred to as the "no impeachment" rule. *Id.* at 1013. However, a narrow exception has been recognized. The exception permits "post trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations." *Id.* Under this exception, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. *Id.* Under no circumstances may jurors testify regarding their subjective reasoning processes. *Id.*

¶ 12 Testimony that jurors sought outside information regarding the standard of care to be followed by health professionals and discussed it during deliberations is not testimony of the jury's reasoning processes; rather it is testimony of overt conduct. Thus, this testimony falls within the exception to the "no impeachment" rule and a juror may testify as to the outside influence. When such overt conduct is related to an issue in the case, as it was here, the potential for prejudice may arise.

¶ 13 Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. *Carter,* 604 A.2d at 1016. In determining the reasonable likelihood of prejudice, the trial judge should consider: (1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature. *Id.,* at 1016–1017. This Court has held that where the extraneous evidence is not new, but rather is evidence that was presented at trial, prejudice is not established. *See Orndoff v. Wilson,* 760 A.2d 1 (Pa.Super.2000).

¶ 14 In this case, the issue is whether the Appellee physicians were negligent in failing to order a neurological consult and CT-scan prior to August 18, 1989. During trial, both sides presented extensive expert testimony with respect to this issue. The outside information sought by the jurors, as described in Ms. Toller's letter, was with regard to "... whether a CAT scan should have been performed earlier, whether both a meningitis test and a CAT scan should have been performed at the same time and whether this was the standard of care in 1989."

¶ 15 The trial court concluded that:

Applying this Pennsylvania principle of law to the instant case, it is clear that the contents of Ms. Toller's letter are insufficient in nature to require a hearing and grant of new trial. It states, to her knowledge, the jurors in question spoke to "various people such as relatives and friends involved in the medical profession and their own personal physicians to get their opinions regarding whether a CAT scan should have been performed earlier"; presumably to determine when the infection should have been discovered. If a hearing were held, what else could Ms. Toller testify about that was not already contained in her letter? If other jurors were subpoenaed, all they would be competent to testify about would be whether they did in fact discuss the case with individuals on the jury. Ms. Toller does not know whether these discussions influenced these jurors nor can these jurors testify to this aspect as well. Consequently, on this basis alone, the Toller letter's contents are insufficient for this court to disturb the verdict.

In addition, it seems that the information which was the subject matter of the extraneous communications was well covered by both sides in the presentation of the parties' respective cases. The issue raised in the letter involved when the CAT scan should have been performed to determine the existence of the subdural empyema. There was ample testimony, presented at trial, by experts from both the plaintiff and the defendants, as to what period in time during the child's treatment, it was reasonable to order the CAT scan. Under the case law cited, if the subject of the so-called outside influence amply had been covered at trial, then any information a juror might have acquired outside the trial itself is irrelevant and moot. While it is true and fundamental that every litigant is entitled to trial comprised of an impartial jury, free to the furthest extent practical from extraneous influences, this principle does not mean that any outside factor raised must necessarily be pursued. A weighing and considering of the no impeachment rule, the nature of the alleged extraneous influence raised in this case,

and its relation to what was presented at the trial, clearly leads to the conclusion that a new trial is not warranted in this instance.

Trial Court Opinion, 5/11/01, at 4–5.

¶ 16 While we agree with the trial court's conclusion, based on the "no impeachment" rule, that the jurors could not testify whether this outside information influenced their decision, we do not agree that a new trial may not be warranted as a result of the information in the Toller letter. If called to testify, the jurors would not be able to testify whether the information obtained influenced their decision; however it is important to determine whether they indeed sought this information from outside sources. If the parties in fact sought this outside information, we conclude that the effect of obtaining this information resulted in prejudice warranting a new trial.

¶ 17 We agree with the trial court's determination that the information sought by the jurors was presented by the parties at trial. We disagree, however, with the conclusion that because like testimony was presented at trial, there is no resulting prejudice requiring an evidentiary hearing or a new trial. We are aware of the cases that have held that where the information sought from outside sources has been presented at trial, there is no prejudice. This case, however, differs from those, and the cases cited therein.

¶ 18 In *Friedman v. Ralph Bros., Inc.*, 314 Pa. 247, 171 A. 900 (1934), the allegation was made that a juror had visited the scene of the accident, had made measurements, and had reported his conclusions to his fellow jurors. The Supreme Court noted that the information he communicated was already before the jury, thus no prejudice could have accrued. *Id.*

¶ 19 In *Orndoff v. Wilson*, 760 A.2d 1 (Pa.Super.2000), Appellant's mother stated that an errant juror was heard to recount his visits to the accident site, where he made investigations, and made conclusions regarding the Appellant's actions regarding the automobile accident. This Court held that, although the juror's conduct was condemned, the information supposedly productive of taint was contained in evidence produced at trial and thus was not prejudicial. *Orndoff*, 760 A.2d at 3.

¶ 20 In *Pittsburgh Nat'l Bank v. Mutual Life Ins. Co.*, 493 Pa. 96, 425 A.2d 383 (1981), there were allegations that a juror had, during the trial, sat in and examined an automobile similar to the vehicle driven by decedent at the time of the fatal crash. Because the information obtained by the juror, and shared with the jury, was information that had been received in evidence, the court refused to allow questioning of the juror in an attempt to impeach his verdict. *Id.*

¶ 21 In the cases cited, it was concluded that there was no resulting prejudice because the information sought was already presented at trial. In the case *sub judice*, however, the jurors went to outside sources to provide an opinion on the testimony offered at trial. Such action, if established, would be prejudicial.

¶ 22 Although not clear from the transcripts,[1] it appears from the trial court opinion, and logically follows that at trial the parties presented testimony and evidence on both sides of the issue. Presumably, Appellants' experts testified that the proper standard of care would have been to conduct the CAT scan earlier than August 18, 1989, and that Appellees' experts testified that conducting the CAT scan as done was the appropriate standard of care.

---

1. The record in this matter contains only partial transcripts of the trial proceedings.

¶ 23 The jurors, by seeking an opinion from an outside source, sought an opinion from someone whom they found to be personally credible, on the core issue in the case. In essence, the jurors at issue sought out a third party's opinion on which testimony presented at trial to accept. Human experience dictates that an individual will more heavily weight an opinion from an individual known to them, than an opinion given by a complete stranger. In this case, the two jurors in essence sought out their own expert testimony, which necessarily served to support one of the two sides at trial. If these allegations of misconduct are true, this action was prejudicial to Appellant and warrants a new trial.

¶ 24 The only information available to us supporting the claim that two jurors engaged in this misconduct is the letter from Ms. Toller. This information was not included in a sworn affidavit and the trial court did not conduct an evidentiary hearing to determine even whether these allegations of misconduct were true. Accordingly, we cannot be certain that these jurors actually engaged in this conduct. Thus, we believe an evidentiary hearing is necessary to determine whether these allegations are true.

¶ 25 We remand solely for an evidentiary hearing on the juror misconduct claim to determine whether the jurors in fact received opinions from outside sources regarding the appropriate standard of care. If, on remand, the trial court concludes that the allegations of juror misconduct are true, judgment should be vacated and a new trial granted, subject to Appellees' right of appeal. If the trial court on remand finds no truth to these allegations, it should deny the post-trial motion, and Appellants shall have a right to appeal that finding.

¶ 26 Case remanded for further proceedings. Jurisdiction relinquished.

¶ 27 CAVANAUGH, J. files a dissenting opinion.

CAVANAUGH, J., dissenting:

¶ 1 I respectfully dissent. I would affirm for the reasons set forth in the opinion of the Honorable Victor J. DiNubile.