J-A22008-22

2023 PA Super 97

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
      v.   :
  :
  :
  :
SHELDON DEVONT JETER   :
  :
       Appellant   :   No. 1523 WDA 2021

Appeal from the Judgment of Sentence Entered July 21, 2021
In the Court of Common Pleas of Beaver County Criminal Division at
No(s):  CP-04-CR-0000825-2020

BEFORE:   OLSON, J., DUBOW, J., and COLINS, J.[*]

OPINION BY OLSON, J.:                  **FILED: JUNE 7, 2023**

Appellant, Sheldon Devont Jeter, appeals from the judgment of sentence entered on July 21, 2021, as made final by the denial of Appellant's post-sentence motion on November 22, 2021.  We vacate the trial court's order of November 22, 2021 denying Appellant's post-sentence motion and we remand for an evidentiary hearing.

The trial court ably summarized the evidence presented during Appellant's jury trial:

> [On the evening of May 15, 2020, Appellant, Tyric Pugh (hereinafter "the Victim"), Appellant's] grandfather Emanuel Moreland, and [Appellant's] uncle Michael Moreland got ice cream at Bruster's.  . . .  Surveillance footage showed the group leaving the parking lot in a Chevrolet Traverse at 9:16 p.m.  They returned to [Appellant's] residence, 127 Orchard Street, at 9:45 p.m., as shown by the motion-activated camera system across the street.  [Appellant] and the Victim

---

[*] Retired Senior Judge assigned to the Superior Court.

got back in the Traverse at 10:10 p.m., and [Appellant] drove to Carlesha Williams's house at 121 Jones Street, in the Plan 6 area of Aliquippa, to deliver a gout pill for Ms. Williams's stepfather. At 10:34 p.m., [Appellant] and the Victim returned to 127 Orchard Street.

At 11:10 p.m., [Appellant] and the Victim again got into the Traverse, which [Appellant] again drove towards Ms. Williams's house to deliver another gout pill. Surveillance footage showed the Traverse traveling towards Ms. Williams's house at 11:18 and 11:19 p.m., and again turning from Cochran Street (the extension of Kiehl Street) onto Franklin Avenue in the direction of 127 Orchard Street at 11:35-11:36 p.m. At 11:39 p.m., [Appellant] returned to 127 Orchard Street alone.

At 11:39 p.m., the Beaver County 911 Center received a call from Joseph Richardson, who reported that there was an unresponsive male on the ground who was bleeding from his head and ears. The 911 Center used the location of Mr. Richardson's phone to get his location, which was the sharp bend on Kiehl Street in Aliquippa. Aliquippa police were dispatched at 11:41 p.m. and arrived at 11:42 p.m. At 11:50 p.m., Aliquippa police requested the assistance of Pennsylvania State Police, who then arrived at the scene.

The Victim had multiple gunshot wounds [to] his head, including in the ear and the forehead between the eyes. The Victim's body was lying faceup in a pool of blood in the road. Several of the Victim's belongings were on and around his body, including a wallet, cash, a credit card, a receipt from Bruster's, a package of cigarillos, and a cell phone and charger. Also around the Victim's body were seven [discharged cartridge cases]: four Federal and three Winchester. A subsequent autopsy of the Victim found six bullet wounds from different angles: penetrating wounds in his left lateral chest, left cheek, left ear, left temporal-parietal scalp, left frontal scalp, and the center of his forehead, and a grazing wound in his left wrist. The Beaver County Coroner's Office concluded that the Victim died as a result of the gunshot wounds to his head and chest.

Police identified the Victim based on a Pennsylvania identification card found in his wallet, which had an address

- 2 -

of 127 Orchard Street. Based on the address on the identification card, Trooper Boughter, Corporal Miller, Trooper Werner, and Trooper McGeary went to 127 Orchard Street to formally notify the Victim's family of his death. Emanuel Moreland and [Appellant] were at the residence. [Appellant] spoke with the officers in the living room of the residence shortly after 3:00 a.m. on May 16, 2020, with his grandfather present. He said that Emanuel Moreland, Michael Moreland, the Victim, and he had gone to Bruster's; that they had returned to the residence; and that the Victim had left on foot after watching television. After Corporal Miller said that the Traverse was seen near Two Cousins Market (on the way to Ms. Williams's house), [Appellant] changed his narrative to [say that he gave] the Victim a ride up the hill. While [Appellant relayed his version of events] to the police, and before the police said that the Victim had died, [Appellant] called Michael Moreland and said that [the Victim] had been shot.

At 4:00 a.m., the police conducted a recorded interview of [Appellant] in the front seat of an unmarked police car on Orchard Street. [Appellant] again stated that the Victim [] left from the residence on foot. [Appellant] said that he had not left since returning to the residence. He agreed to have his hands swabbed for the police to perform a gunshot residue test. After initially denying that he had been around any firearms, [Appellant] stated that he [] touched [a firearm belonging to his brother, Deonte Smith,] two days prior.

[Appellant] consented to the police taking and processing the Traverse, as did the Traverse's registered owners. The police obtained a search warrant for the Traverse. Testing revealed gunshot residue on samples collected from the interior driver's side door, the center of the steering wheel, and the upper right quadrant of the steering wheel. The remaining samples tested for gunshot residue, including from [Appellant's] hands, were not characteristic but were indicative, which means that they had particles containing two out of the three elements of barium, lead, and antimony.

[Appellant] was interviewed at the Pennsylvania State Police Beaver Barracks. Again, he said that the Victim left from his house. He said that he went to Ms. Williams's house twice. When he was told of the surveillance videos showing him and

the Victim leaving the house together, he said that "we left the house the first time and the second time." Later in the interview, [Appellant] said that when he drove to Ms. Williams's house, the Victim stayed in the passenger seat while he dropped off the gout pill, and the car got foggy. He clarified that he meant the second trip, and that the Victim left on foot from Ms. Williams's house. He told the police which route he took to go home.

The police obtained a search warrant for the residence at 127 Orchard Street, which was executed at the same time that [Appellant] was [] interviewed at the barracks. Pursuant to the warrant, the police seized items from [Appellant's] bedroom, including a Glock G42 .380 pistol, a six-round magazine containing six Federal .380 rounds, a PMC box containing 46 PMC [rounds] and [one] Federal .380 round[], and two boxes of Federal .380 ammunition. The Glock and magazine had the capacity to hold seven rounds. The PMC ammunition box had 50 slots, three of which were empty. One Federal ammunition box was sealed and contained 20 rounds. The other Federal ammunition box was opened and [contained ten] rounds, with space for [ten] more.

The police officers executing the warrant advised the barracks that they [recovered] the gun in [Appellant's] bedroom. At this point, [Appellant] admitted that he had a gun, which he described as a 9-millimeter "baby Glock." He stated that he [saw] it the day before (which was May 15, 2020) and that he never [loaned] or gave the gun to anyone.

Pennsylvania State Police Sergeant Richard Podbielski, a firearm and tool mark examiner, concluded first that the Glock was functional and capable of discharging .380 [caliber] ammunition. He next concluded that the seven [discharged cartridge cases] that were recovered from the scene had been discharged from the Glock that was recovered from [Appellant's] bedroom. In a subsequent test, he analyzed 16 bullets, bullet fragments, bullet jacket fragments, and lead fragments that were recovered from the Victim. He concluded that five of them were discharged from the Glock, two were inconclusive, and the remaining nine were not suitable for identification purposes.

Trial Court Opinion, 1/31/22, at 3-7 (citations and footnotes omitted).

On June 23, 2021, the jury found Appellant guilty of first-degree murder[1] and, on July 21, 2021, the trial court sentenced Appellant to serve the mandatory term of life imprisonment. N.T. Sentencing, 7/21/21, at 51.

Appellant filed a timely post-sentence motion[2] and, within this motion, Appellant claimed that he was entitled to an evidentiary hearing to determine whether "prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention" or whether "an outside influence was improperly brought to bear on any juror." *See* Appellant's Post-Sentence Motion, 8/20/21, at 3-10; *see also* Pa.R.E. 606(b)(2).

Within Appellant's post-sentence motion, Appellant noted that he "had previously been widely publicly reported as a person of interest in the extremely high-profile investigation of the 2018 homicide of Rachel DelTondo, one of the most infamous crimes in Beaver County's history, and, in fact, reports regarding [the case at bar] referenced [Appellant's] status in that regard." Appellant's Post-Sentence Motion, 8/20/21, at 3. According to

---

[1] 18 Pa.C.S.A. § 2502(a).

[2] On August 2, 2021, the trial court granted Appellant an extension of time to file his post-sentence motion and allowed Appellant to file his "post-sentence motion no later than 30 days after sentencing." Trial Court Order, 8/2/21, at 1; *see Commonwealth v. Moore*, 978 A.2d 988, 991 (Pa. Super. 2009) (holding: "[t]he trial court clearly [has] the authority to grant or deny [an a]ppellant an extension of time in which to file his post-sentence motion"). Appellant filed his motion on August 20, 2021, which was within the allotted time. Appellant's Post-Sentence Motion, 8/20/21, at 1.

Appellant, after his trial concluded, he learned that "Juror Number 3 and her now-estranged husband [] lived with her parents next door to the [DelTondo] crime scene and were actually present when" Rachel DelTondo was murdered. *Id.* at 4 (emphasis omitted). Appellant further learned that, "at the time of the DelTondo homicide, Juror Number 3's husband viewed DelTondo's corpse, which contributed to his development of post-traumatic stress disorder, which in turn contributed to Juror Number 3's and [her husband's] estrangement and divorce." *Id.*

With this backdrop, Appellant claimed that, after the jury was discharged, he learned of two instances where potentially extraneous information might have been communicated to the jurors or where an outside influence might have been improperly brought to bear upon a juror. *See id.* at 3-10. First, Appellant attached an affidavit from a local attorney and trial spectator named Jodi Gill (hereinafter "Attorney Gill"), where she averred:

> during [a sidebar at Appellant's trial,] there were two women spectators who . . . were talking very loudly about . . . the Rachel DelTondo case . . . [and] were speaking so loudly that the [court reporter transcribing witness testimony at Appellant's trial] . . . had to tell them to stop talking in front of the jurors.

Affidavit of Attorney Gill, 7/19/21, at 1-3.[3]

_____

[3] Attorney Gill's affidavit more fully stated:

> 2. I attended some of [Appellant's] trial.

> . . .

*(Footnote Continued Next Page)*

Second, Appellant attached an affidavit from his attorney, Alexis Cobb (hereinafter "Attorney Cobb"), where she averred that she spoke with the former father-in-law of Juror Number 3. As Attorney Cobb averred, Juror Number 3's former father-in-law told her that he spoke with Juror Number 3's father (hereinafter "Juror Number 3's Father"). According to the former father-in-law, he learned from Juror Number 3's Father that Juror Number 3 and Juror Number 3's Father "talked about the case during the jury

_____

4. While I attended the trial, I noticed that there were a number of sidebars where the judge, the attorneys for both the prosecution and the defense, and a court reporter would leave the courtroom.

. . .

10. [On June 17, 2021, during a sidebar,] there were two women spectators, who were sitting near the yellow tape right beside the jurors; these spectators were talking very loudly about . . . the Rachel DelTondo case. They were counting the jurors out trying to determine who were the alternates. I have to emphasize that they were talking very loudly amongst each other and that their voices were carrying.

. . .

12. The two women spectators were speaking so loudly that the [court reporter transcribing witness testimony at Appellant's trial] . . . had to tell them to stop talking in front of the jurors. Specifically, I remember [the reporter] reprimanding the two female spectators. He informed them that they were not allowed to be discussing the jurors and the case in this manner and that their behavior "could get them in big trouble" and could "cause a mistrial."

Affidavit of Attorney Gill, 7/19/21, at 1-3.

deliberations and that [Juror Number 3] was having a hard time deciding what to do and that [Juror Number 3] and [Juror Number 3's Father] 'prayed on it' and after they prayed, [Juror Number 3] made her decision." Affidavit of Attorney Cobb, 7/19/21, at 1-2.[4]

Appellant requested that the trial court hold an evidentiary hearing, where it could receive juror testimony and determine whether any of the jurors received extraneous information or were subjected to outside influence and, if so, determine whether Appellant is entitled to a new trial. *See* Appellant's Post-Sentence Motion, 8/20/21, at 10.

The trial court heard oral argument on Appellant's post-sentence motion. On November 22, 2021, however, the trial court denied Appellant's post-sentence motion in total, including Appellant's request for an evidentiary hearing. Trial Court Order, 11/22/21, at 1. Appellant filed a timely notice of appeal, raising a single claim to this Court:

> Did the trial court err in refusing to grant an evidentiary hearing on external juror influence where [Appellant] provided sufficient information to raise a judicial question as to whether the jury was exposed to external influence tying him to a separate murder and/or whether one juror listened to her father's advice as to whether to convict?

Appellant's Brief at 4.

---

[4] According to Attorney Cobb's affidavit, Juror Number 3's former father-in-law "was not comfortable with executing an affidavit . . . because as an African American male, he does not trust the judicial system." Affidavit of Attorney Cobb, 7/19/21, at 2.

Appellant claims that the trial court erred when it denied his request to hold an evidentiary hearing, so that the trial court could determine whether any of the jurors received extraneous information or were subjected to outside influence. We review the trial court's denial of Appellant's request for an evidentiary hearing under an abuse of discretion standard. *See Pratt v. St. Christopher's Hosp.*, 866 A.2d 313, 324 (Pa. 2005) (holding: "[t]he procedure for development of [post-verdict claims alleging] . . . extraneous information and/or outside influence affecting jury deliberations . . . and their ultimate disposition remain vested, in the first instance, within the sound discretion of the trial courts. Here, we sustain the Superior Court's holding that the trial court abused its discretion in the failure to afford a requested evidentiary hearing" on the issue of whether extraneous information or outside influence affected jury deliberations). "When the facts surrounding the possible [juror] misconduct are in dispute, the trial judge should examine the various witnesses on the question, and [the judge's] findings of fact will be sustained unless there is an abuse of discretion." *Commonwealth v. Pope*, 14 A.3d 139, 145 (Pa. Super. 2011) (quotation marks and citations omitted).

"Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Baumhammers*, 960 A.2d 59, 86 (Pa. 2008) (quotation marks and citation omitted). "A finding by an appellate court that it would have reached a

different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." ***Harman ex rel. Harman v. Borah***, 756 A.2d 1116, 1123 (Pa. 2000) (quotation marks and citations omitted).

Pennsylvania Rule of Evidence 606 is entitled "juror's competency as a witness" and offers guidance concerning the examination of a juror when the trial court initiates an inquiry into the circumstances that surround juror deliberations. Rule 606(b) declares:

> **(b) During an Inquiry into the Validity of a Verdict**
>
> *(1) Prohibited Testimony or Other Evidence*. During an inquiry into the validity of a verdict, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
>
> *(2) Exceptions*. A juror may testify about whether:
>
>> (A) prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention; or
>>
>> (B) an outside influence was improperly brought to bear on any juror.

Pa.R.E. 606(b).

Rule 606(b)(1) sets forth the general "no-impeachment rule" that governs the admissibility of post-verdict testimony by jurors. It declares that, during an inquiry into the validity of the verdict, a juror may not testify about:

- 10 -

1) "any statement made or incident that occurred during the jury's deliberations;" 2) "the effect of anything on that juror's or another juror's vote;" or 3) "any juror's mental processes concerning the verdict." Pa.R.E. 606(b)(1). The rule further provides that a trial court may not receive "a juror's affidavit or evidence of a juror's statement" concerning the above-stated, prohibited matters. *Id.* Rule 606(b)(2) then provides two exceptions to the general rule, declaring that jurors are competent to testify about whether: 1) "prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention" and 2) "an outside influence was improperly brought to bear on any juror." Pa.R.E. 606(b)(2); *see also Commonwealth v. Messersmith*, 860 A.2d 1078, 1085 (Pa. Super. 2004) ("[u]nder the exception[s] to the no impeachment rule, a juror may testify only as to the existence of the [extraneous information or] outside influence, but not as to the effect this [] may have had on deliberations. Under no circumstances may jurors testify about their subjective reasoning processes") (quotation marks and citations omitted).

As our Supreme Court has explained, Rule 606(b) "reflects a policy decision balancing the aim to ensure fair and impartial decision-making, with the interests in confidentiality of jury deliberations and finality of duly rendered verdicts." *Pratt*, 866 A.2d at 320 (footnotes omitted). Further, as the United States Supreme Court explained when it interpreted Rule 606(b)'s federal counterpart, the rule "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they

will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict.  The rule gives stability and finality to verdicts." **Peña-Rodriguez v. Colorado**, 580 U.S. 206, 218 (2017);[5] **see also Pratt**, 866 A.2d at 320 n.8; 27 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE EVIDENCE § 6072 (2d ed. 2022) ("[Federal Rule of Evidence] 606(b) has two policy goals.  First, the privacy of the jury's thought process is protected in order to insulate jury value judgments from judicial scrutiny.  Second, finality and certainty of judgment are promoted in order to conserve resources.  Neither goal is an absolute.  Privacy is abandoned when jury value judgments are not in jeopardy or embrace values that are simply beyond the pale, such

---

[5] In **Pratt**, the Pennsylvania Supreme Court noted that Pennsylvania Rule of Evidence 606(b)'s general "'no impeachment rule,' as well as the prevailing exceptions relating to 'prejudicial facts not of record, and beyond common knowledge and experience' and 'outside influences'" are "substantially identical" to those found in its federal counterpart, Federal Rule of Evidence 606(b).  **Pratt**, 866 A.2d at 319 and 319 n.6; *compare* Pa.R.E. 606(b) *with* F.R.E. 606(b); **see also** Pa.R.E. 606 cmt.  The **Pratt** Court further noted that, on these issues, Pennsylvania's main deviation from the federal rule was in utilizing the phrase "prejudicial facts not of record, and beyond common knowledge and experience," in place of the federal rule's language "extraneous prejudicial information was improperly brought to the jury's attention."  **Pratt**, 866 A.2d at 319 n.6; *compare* Pa.R.E. 606(b)(2)(A) *with* F.R.E.(b)(2)(A).  However, as the **Pratt** Court explained, this particular deviation between the two rules "was intended merely for the sake of clarification as opposed to substantive departure."  **Pratt**, 866 A.2d at 319 n.6.

as racial discrimination.[6] Finality and certainty give way when jury misconduct raises serious issues of fairness and accuracy").

In **Pratt**, the Pennsylvania Supreme Court interpreted Rule 606(b) and provided some guidance regarding the threshold at which further judicial inquiry must be made in those instances where a party seeks to inquire into the validity of a verdict. **Pratt** was a civil, medical malpractice case, where the plaintiffs (hereinafter "the Plaintiffs") sued a hospital and various doctors (hereinafter "the Medical Defendants") on allegations that the Medical Defendants failed to diagnose an infection in a timely manner. **Pratt**, 866 A.2d at 314. Essentially, the Plaintiffs claimed that the Medical Defendants "were negligent in failing to timely order a CAT scan." **See id.** at 317 and 321. Following trial, the jury found in favor of the Medical Defendants, "with polling confirming that ten of the twelve jurors supported the verdict." **Id.** at 314.

"Approximately two weeks later, the trial court received a letter from one of the jurors (Juror 10) indicating that, during deliberations, she had learned from several other jurors that they had discussed the case with outside medical professionals, who were friends, relatives and/or personal

---

[6] **See**, **e.g.**, **Peña-Rodriguez**, 580 U.S. at 225 (holding: "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee").

physicians." ***Id.*** at 314-315. "In the letter, Juror 10 also expressed her belief that such improper contacts had influenced the verdict." ***Id.*** at 315. In relevant part, Juror 10's letter read:

> I want to stress that I believe that my fellow jurors worked hard to reach what they believed was a proper verdict, but I think that they relied inappropriately on information they gathered from sources outside the courtroom to reach that verdict. Beginning during the trial and continuing through deliberations, some of the jurors reported that they had spoken to various people such as relatives and friends involved in the medical profession and their own personal physicians to get their opinions regarding whether a CAT scan should have been performed earlier, whether a meningitis test and CAT scan should have been performed at the same time and whether this was the standard of care in 1989. Two of the jurors reported conversations with multiple medical professionals that occurred on the first evening of deliberations. I believe that the opinions these jurors obtained from the outside sources influenced the verdict because the jurors discussed these outside opinions during deliberations and stated that their conversations with the medical professionals either confirmed the jurors' own opinions or changed the jurors' minds.

***Id.*** at 315 n.2.

After the trial court provided the parties with copies of the letter, the Plaintiffs filed a post-trial motion *nunc pro tunc*. Within the motion, the Plaintiffs requested an evidentiary hearing on the issue of whether the jury's verdict was tainted, as "prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention." ***See id.*** at 315; ***see also*** Pa.R.E. 606(b)(2)(A). The trial court denied the Plaintiffs' motion without holding a hearing. ***Pratt***, 866 A.2d at 315.

- 14 -

Within the trial court's opinion, the court initially declared that, under Rule 606(b), "Juror 10 was not necessarily incompetent to testify concerning the contents of her letter," as Juror 10 alleged that "prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention" – and, thus, her allegations fell under an exception to Rule 606(b)'s general, no-impeachment rule. *Pratt*, 866 A.2d at 315-316. However, the trial court "determined that the letter did not contain a sufficient indication of prejudice to warrant a hearing" on the issue. *Id.*

On appeal to the Superior Court, we determined that the trial court abused its discretion when it failed to hold an evidentiary hearing on the Plaintiffs' post-trial motion. Thus, we reversed and remanded the case "solely for an evidentiary hearing on the juror misconduct claim." *Pratt v. St. Christopher's Hosp.*, 824 A.2d 299, 305 (Pa. Super. 2003). The Medical Defendants then appealed to the Pennsylvania Supreme Court and the Supreme Court affirmed this Court's ruling.

Initially, the Supreme Court agreed with the rulings issued by this Court and the trial court, declaring that, under Rule 606(b), the jurors were competent to testify regarding the contents of Juror 10's letter. *Pratt*, 866 A.2d at 321. Specifically, the Supreme Court held, "the circumstances of the [] case squarely implicate [Rule 606(b)'s] extraneous-information exception, since [the Plaintiffs] alleged [that some jurors had] inappropriate contact with outside medical professionals." *Id.* Therefore, the Supreme Court held that, under Rule 606(b), the jurors were competent to testify on the issues of:

- 15 -

"whether or not the alleged communications occurred, regarding their range and content, and as to whether they were in fact injected into the jury deliberations." *Id.*; *see also Messersmith*, 860 A.2d at 1085 ("[u]nder the exception to the no impeachment rule, a juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. Under no circumstances may jurors testify about their subjective reasoning processes . . . [and] a trial judge may not consider evidence regarding the subjective impact of an extraneous influence on any juror") (quotation marks and citations omitted).

Next, the *Pratt* Court held, to measure the prejudicial impact of any extraneous information or outside influence, a court must apply an "objective test for prejudice as well as the associated guidelines that [were] set forth in the lead opinion in" *Carter by Carter v. U.S. Steel Corp.*, 604 A.2d 1010, 1016-1017 (Pa. 1992) (plurality). *Pratt*, 866 A.2d at 324. In *Carter*, the Supreme Court declared:

> Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. Because a trial judge is precluded from considering evidence concerning the subjective impact of an extraneous influence on any juror, it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence. In addition, cases from other jurisdictions which have considered the prejudicial effect of an extraneous influence, make clear that prejudice is to be determined in light of the facts and circumstances in each

case. Where the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case.

. . .

We begin our consideration of the proper standard of prejudice by examining the analogous situation involving an *ex parte* communication between a judge and jury, a situation which, like an extraneous influence, implicates the impartiality and integrity of the jury. In ***Commonwealth v. Bradley***, 459 A.2d 733 (Pa. 1983), [the Pennsylvania Supreme] Court **adopted a rule to be applied in both civil and criminal cases** where a party seeks to have the verdict set aside on the basis of an *ex parte* communication between a judge and jury. A new trial will be granted in such cases only where there is a reasonable likelihood of prejudice. Given the similar concerns inherent in *ex parte* communications and extraneous influences, such a standard is appropriate whenever the existence of an extraneous influence has been established by competent evidence, **and we now adopt this standard for all such cases**, with the understanding that the burden of proof is upon the moving party. In determining the reasonable likelihood of prejudice, the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

***Carter***, 604 A.2d at 1016-1017 (quotation marks, corrections, footnotes, and some citations omitted) (emphasis added).[7]

---

[7] The ***Carter*** Court emphasized that "the three considerations listed [above] are not intended as a 'three-part-test' or a 'rule.' The considerations are intended as guidance for trial courts in determining whether, under the facts and circumstances of the case, extraneous information is reasonably likely to have prejudiced the jury." ***Carter***, 604 A.2d at 422 n.7.

The *Pratt* Court next held that the trial court abused its discretion when it denied the Plaintiffs an evidentiary hearing to develop their juror misconduct claim. On this issue, the *Pratt* Court observed that Juror 10's letter claimed certain, wayward jurors sought out and received extraneous information from trusted, outside medical professionals. *Pratt*, 866 A.2d at 315, 321, and 323 n.13. This extraneous information "pertained to a central, disputed issue in the case, namely the applicable medical standard of care and, more specifically, whether a CAT scan was implicated at an early stage of the medical evaluation." *Id.* at 321; *see also Pratt v. St. Christopher's Hosp.*, 824 A.2d 299, 305 (Pa. Super. 2003) (declaring: "[t]he jurors, by seeking an opinion from an outside source, sought an opinion from someone whom they found to be personally credible, on the core issue in the case. In essence, the jurors at issue sought out a third party's opinion on which testimony presented at trial to accept. . . . In this case, the two jurors in essence sought out their own expert testimony, which necessarily served to support one of the two sides at trial"). The *Pratt* Court further noted that, although Juror 10's letter did not specifically declare that the extra-record information "was received by majority or minority jurors," "the tenor of the letter certainly raises the implication that unfavorable information was received by majority jurors." *Pratt*, 866 A.2d at 323. Thus, the *Pratt* Court held, the Plaintiffs satisfied their threshold showing of potential prejudice, which was necessary to warrant an evidentiary hearing on the issue. *See id.* at 323; *Carter*, 604 A.2d at 1016 ("[o]nce the existence of a potentially prejudicial extraneous influence

has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence").

The ***Pratt*** Court did, however, note that "Juror 10's affidavit lacks specificity in material respects, and therefore, even if believed, would not, in and of itself, establish the quantum of prejudice necessary to disturb the verdict." ***Pratt***, 866 A.2d at 322-323.  For example, the ***Pratt*** Court noted: "Juror 10's letter is not specific in terms of whether the extra-record information allegedly communicated to jurors was favorable or unfavorable to" the Plaintiffs and, as stated above, the letter in this civil case did not specifically declare whether the extra-record information "was received by majority or minority jurors." ***Id.*** at 323.  Moreover, as the ***Pratt*** dissent observed, Juror 10's letter was not sworn and the allegations within the letter were based upon hearsay.  ***Pratt***, 866 A.2d at 325 and 328 (Newman, J., dissenting).

Notwithstanding the ambiguities and deficiencies in Juror 10's letter, the ***Pratt*** Court held that the Plaintiffs were entitled to an evidentiary hearing to develop their juror misconduct claim.  Weighing in favor of an evidentiary hearing, the Supreme Court deemed significant the fact that, in its prior opinions, the Supreme Court "has discouraged pointed, post-verdict discussions between disappointed litigants and discharged jurors that are specifically directed toward collecting evidence with which to impeach the verdict." ***Pratt***, 866 A.2d at 323, *quoting* ***Commonwealth v. Patrick***, 206 A.2d 295, 297 (Pa. 1965) ("[t]he practice of interviewing jurors after a verdict

- 19 -

and obtaining from them *ex parte*, unsworn statements in answer to undisclosed questions and representations by the interviewers is highly unethical and improper and was long ago condemned by [the Pennsylvania Supreme Court.] . . . It is forbidden by public policy") (quotation marks, citations, and emphasis omitted). "Given such constraints," the **Pratt** Court held, "the Superior Court did not err in determining that Juror 10's affidavit was sufficient to implicate further investigation by the trial court *via* an evidentiary hearing." **Pratt**, 866 A.2d at 323.

Finally, the Supreme Court rejected the Plaintiffs' request to simply order a new trial in the case. Among other reasons for denying the Plaintiffs' request for a new trial and limiting the relief to an evidentiary hearing on the Plaintiffs' post-trial motion, the Supreme Court declared: "[i]n the post-verdict setting, . . . the interest in finality weighs substantially in favor of evidentiary development and factual determination, with the burden of proof allocated to the party contesting the verdict." **Id.** Put differently, in such cases, a new trial is warranted only where the party contesting the verdict is able to prove a reasonable likelihood of prejudice, not simply a threshold showing of potential prejudice, which merely necessitates an evidentiary hearing. **See id.**

In the case at bar, Appellant contends that the trial court abused its discretion when it refused to hold an evidentiary hearing to investigate his claims that the jurors received extraneous information or were subjected to an outside influence. Appellant's Brief at 4. As noted above, Appellant's

- 20 -

claims of extraneous information and outside influence are: 1) Attorney Gill's averment that, "during [a sidebar at Appellant's trial,] there were two women spectators who . . . were talking very loudly about . . . the Rachel DelTondo case . . . [and] were speaking so loudly that the reporter . . . had to tell them to stop talking in front of the jurors" and 2) Attorney Cobb's averment that Juror Number 3 and Juror Number 3's Father "talked about the case during the jury deliberations and that [Juror Number 3] was having a hard time deciding what to do and that [Juror Number 3] and [Juror Number 3's Father] 'prayed on it' and after they prayed, [Juror Number 3] made her decision." *Id.* at 11-32; Affidavit of Attorney Gill, 7/19/21, at 1-3; Affidavit of Attorney Cobb, 7/19/21, at 1-2.

We conclude that Appellant is not entitled to relief on his first claim, which alleged juror exposure to extraneous information through courtroom discussion between two trial spectators. With respect to Appellant's second issue, however, we conclude that the trial court abused its discretion when it refused to hold an evidentiary hearing to examine the substance and surrounding circumstances of the discussion between Juror Number 3 and Juror Number 3's Father, when they "talked about the case during the jury deliberations." *See* Affidavit of Attorney Cobb, 7/19/21, at 2. Therefore, we vacate the trial court's order denying Appellant's post-sentence motion and remand solely for an evidentiary hearing on this issue.

We start with Appellant's claim that, during a sidebar at his trial, the jurors received extraneous information when two trial spectators talked "very

loudly about . . . the Rachel DelTondo case." Appellant's Brief at 17; Affidavit of Attorney Gill, 7/19/21, at 1-3. Appellant claims that these facts, as attested to by Attorney Gill, are sufficient to warrant an evidentiary hearing to investigate "whether the jurors were subjected to external influence tying [Appellant] to the Rachel DelTondo murder." Appellant's Brief at 17. Specifically, Appellant argues, "[a]lthough it is unclear whether the [spectators'] conversation did, in fact, tie [Appellant] to the murder, given that it occurred at [Appellant's] trial, there is at least an implication that it did." *Id.* Appellant's claim fails.

Here, Attorney Gill averred that she heard the loud conversation between the two trial spectators – and Attorney Gill never stated that the conversation "tied" Appellant to Rachel DelTondo's murder. Instead, Attorney Gill merely stated that the two trial spectators were "talking about" "the Rachel DelTondo case." Affidavit of Attorney Gill, 7/19/21, at 2-3. However, as Appellant concedes, Rachel DelTondo's murder was "high-profile" and "highly-publicized" in the county. *See* Appellant's Brief at 6-7.

The discussion of a "high-profile," "highly-publicized," and newsworthy case between trial spectators is not unusual. Further, although Attorney Gill heard the spectators' discussion, she did not state that the trial spectators mentioned Appellant, much less connected him to Rachel DelTondo's murder. Finally, the trial court considered the claim and concluded that neither the discussion nor the subject of the discussion raised any implication that the

spectators made any connection between Appellant and Rachel DelTondo's murder. *See* Trial Court Opinion, 1/31/22, at 29.

Thus, Appellant's claim that the conversation might have "tied" Appellant to Rachel DelTondo's murder goes beyond mere speculation – it is simply not supported by the first-hand account of Attorney Gill. Moreover, since the relevant facts surrounding this claim of extraneous information are not in dispute and did not raise the potential for prejudice, the trial court did not abuse its discretion when it denied Appellant's request for an evidentiary hearing on the issue. *See*, *e.g.*, *Pope*, 14 A.3d at 145 ("[w]hen the facts surrounding the possible [jury] misconduct are in dispute, the trial judge should examine the various witnesses on the question"); *see also Carter*, 604 A.2d at 1016-1017.

Next, Appellant claims that the trial court abused its discretion when it refused to hold an evidentiary hearing to investigate his claim that Juror Number 3 received extraneous information or was subjected to an outside influence, when Juror Number 3 "talked [to her father] about [Appellant's] case." *See* Appellant's Brief at 18-19. These factual allegations were raised in Attorney Cobb's affidavit and based upon layered hearsay. Specifically, Attorney Cobb averred that: she spoke with the former father-in-law of Juror Number 3; Juror Number 3's former father-in-law told Attorney Cobb that he spoke with Juror Number 3's Father; and, according to the former father-in-law, Juror Number 3 and Juror Number 3's Father "talked about the case during the jury deliberations and that [Juror Number 3] was having a hard

time deciding what to do and that [Juror Number 3] and [Juror Number 3's Father] 'prayed on it' and after they prayed, [Juror Number 3] made her decision." Affidavit of Attorney Cobb, 7/19/21, at 1-2.

According to Appellant, he is entitled to an evidentiary hearing to determine whether Juror Number 3 received extraneous information or was subjected to an outside influence because Attorney Cobb's affidavit alleges that:

> [Juror Number 3 and Juror Number 3's Father] "talked about how she was a juror and what was happening during the trial" and "about the case" before they "prayed on it" and "she made her decision." The clear import of the affidavit in this regard is that Juror Number 3 and her father had a conversation about the trial . . . [and] the "central issue in the case": whether to convict.

Appellant's Brief at 30-31 (citations and emphasis omitted).

We agree with Appellant and conclude that the trial court abused its discretion when it refused to hold an evidentiary hearing to examine the circumstances surrounding, and substance of, the discussion between Juror Number 3 and Juror Number 3's Father, when they "talked about the case during the jury deliberations." *See* Affidavit of Attorney Cobb, 7/19/21, at 2.

"The impartiality and integrity of the jury are critical to the proper functioning of our judicial system." *Commonwealth v. Winstead*, 547 A.2d 788 (Pa. Super. 1988); *see also Dietz v. Bouldin*, 579 U.S. 40, 48 (2016) ("the guarantee of an impartial jury [] is vital to the fair administration of justice"). To ensure the impartiality and integrity of the jury, "[j]urors are

customarily instructed not to discuss the case with anyone and to avoid contact with media covering the case." ***Bruckshaw v. Frankford Hosp.***, 58 A.3d 102, 110 (Pa. 2012); ***see also*** Pa.R.Crim.P. 626(C) ("[a]t a minimum, the persons reporting for jury service shall be instructed that until their service as prospective or selected jurors is concluded, they shall not:  (1) discuss any case in which they have been chosen as prospective jurors or selected jurors with others, including other jurors, except as instructed by the court"); Pa.S.S.J.I. (Crim.) § 2.06 ("You cannot even discuss the case with members of your family, close friends, court personnel, or other members of the jury").[8] Indeed, in the federal context, the United States Supreme Court has held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

***Remmer v. United States***, 347 U.S. 227, 229 (1954); ***but see Pratt***, 866 A.2d at 324 ("in instances of post-verdict allegations of extraneous information and/or outside influence affecting jury deliberations, we adopt the objective test for prejudice as well as the associated guidelines that are set forth in the lead opinion in ***Carter***, 604 A.2d at 1016-1017"); ***Carter***, 604 A.2d at 1016-1017 (declaring that the objective test for prejudice and the

---

[8] In the case at bar, the trial court thoroughly and ably instructed the jurors on their duty to avoid outside influence and to refrain from discussing the case with anyone.  ***See*** N.T. Trial, 6/10/21, at 34-36.

associated guidelines derive from criminal law and apply to "all" cases); *Pope*, 14 A.3d at 145-147 (applying the objective test for prejudice and the *Carter* guidelines in the criminal context, where the defendant claimed that a juror made an unauthorized visit to the scene of the crime and was exposed to prejudicial, extraneous information); *see also Shoop v. Cunningham*, 143 S.Ct. 37, 42 and 42 n.5 (2022) (Thomas, J., dissenting) (noting: "it is not [] clear that *Remmer* established **any** constitutional rule. Words like 'constitutional' and 'due process' are nowhere to be found in the [*Remmer*] Court's laconic opinion. One could just as naturally – perhaps more naturally – read *Remmer* as a case about new-trial motion practice under the Federal Rules of Criminal Procedure than as one about the requirements of constitutional due process. . . . [Further,] *Smith v. Phillips*, 455 U.S. 209 (1982), did not hold that *Remmer* was binding on state courts as a matter of constitutional due process; rather, it held only that a state court did not **violate** due process by responding to an allegation of juror impartiality with a hearing that would have satisfied *Remmer* had it occurred in the federal system") (emphasis in original).[9]

_____

[9] In *Pratt*, the Pennsylvania Supreme Court observed:

> In the criminal law arena, a few decisions of the United States Supreme Court suggest that a presumption of prejudice may be warranted in some scenarios involving jury tampering and/or misconduct, *see*, *e.g.*, [*Remmer*, 347 U.S. at 229–30], although more recent decisions militate to the contrary. *See United*

*(Footnote Continued Next Page)*

Appellant alleged that, during jury deliberations, Juror Number 3 "was having a hard time deciding what to do" and "talked about the case" with her father. He further alleged that, after this discussion (and prayer), "[Juror Number 3] made her decision." *See* Affidavit of Attorney Cobb, 7/19/21, at 2.

We initially note that Juror Number 3 is competent to testify about what she and her father discussed, when they "talked about the case during the jury deliberations." To be sure, Juror Number 3's discussion of the case with an outside individual squarely implicates either or both of the extraneous information or outside influence exceptions to the no-impeachment rule. *See* Pa.R.E. 606(b).

Further, we conclude that, under *Pratt*, the trial court abused its discretion when it denied Appellant's request for an evidentiary hearing on this issue, as Appellant's factual allegations satisfy the threshold showing of potential prejudice.

Here, Attorney Cobb's affidavit unequivocally alleges that Juror Number 3 "talked about the case" with her father. Affidavit of Attorney Cobb, 7/19/21, at 2. Further, the allegations in the affidavit imply: that Juror Number 3

---

*States v. Olano*, 507 U.S. 725 (1993); [*Smith v. Phillips*, 455 U.S. 209, 214–217 (1982)].

*Pratt*, 866 A.2d at 322 n.11. The *Pratt* Court further noted that "some adjustment of the relevant test and/or burden may be warranted if the extraneous information or outside influence was brought to bear upon the jurors *via* misconduct on the part of the prevailing party." *Id.*

- 27 -

discussed the case with her father because she was "having a hard time deciding" how to vote; that the two discussed the specific facts of Appellant's case; that the discussion revolved around the "central issue in the case" (*i.e.* Appellant's guilt or innocence); and that, after discussing the case with her father, Juror Number 3 decided to vote guilty. ***See***, ***e.g.***, ***Commonwealth v. Jackson***, 324 A.2d 350, (Pa. 1974) ("[a] criminal defendant who is tried before a jury can only be convicted by unanimous verdict"); ***see also Pratt***, 866 A.2d at 323 (looking to the "implication[s]" of Juror 10's allegations to determine whether a hearing was warranted); ***Carter***, 604 A.2d at 1016-1017 ("[i]n determining the reasonable likelihood of prejudice, the trial judge should consider . . . whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue"). These circumstances satisfy the threshold showing of potential prejudice and warrant further investigation to determine whether Juror Number 3's Father provided Juror Number 3 with "prejudicial information not of record and beyond common knowledge and experience" or improperly brought to bear an outside influence upon her. ***See*** Pa.R.E. 606(b)(2). Thus, we conclude that the trial court abused its discretion when it denied Appellant's request for an evidentiary hearing on this issue.

It is true that Attorney Cobb's affidavit does not reveal the substance of Juror Number 3's discussion with her father and it does not allege that Juror Number 3's Father supplied Juror Number 3 with prejudicial information or subjected Juror Number 3 to outside influence. Further, Attorney Cobb's affidavit is based upon layers of hearsay. Nevertheless, in ***Pratt***, the Supreme

Court concluded that the trial court abused its discretion when it refused to hold an evidentiary hearing on its juror misconduct claim, despite similar deficiencies. Indeed, in **Pratt**, the allegations of juror misconduct were contained in an unsworn letter and based upon hearsay. Further, in **Pratt**, the allegations of juror misconduct were "not specific in terms of whether the extra-record information allegedly communicated to jurors was favorable or unfavorable to" the movants and the letter did not specifically declare whether the extra-record information in the civil case "was received by majority or minority jurors." **See Pratt**, 866 A.2d at 322-323. Finally (and echoing **Pratt**), given the confidential and protected nature of the jury deliberation process, it does not strike us as unusual that claims involving the introduction of extraneous information or outside influence begin as generalized declarations passed between and among jurors, family members, courtroom participants, and onlookers. **See id.** at 323 (noting that the Supreme Court "has discouraged pointed, post-verdict discussions between disappointed litigants and discharged jurors that are specifically directed toward collecting evidence with which to impeach the verdict"). Thus, in following **Pratt**, we conclude that the deficiencies in Attorney Cobb's affidavit do not preclude an evidentiary hearing in this case.

In conclusion, we must vacate the trial court's order of November 22, 2021 denying Appellant's post-sentence motion and remand the case, to enable the trial court to conduct an evidentiary hearing and determine: whether or not Juror Number 3 and her father "talked about the case during

the jury deliberations;" the circumstances surrounding the alleged communications; the substance of what Juror Number 3 and Juror Number 3's Father discussed, when they "talked about the case during the jury deliberations;" and, the prejudicial impact of any such extraneous information or outside influence by applying the "objective test for prejudice as well as the associated guidelines that [were] set forth in the lead opinion in *Carter*, 604 A.2d at 1016-1017."[10]  *Pratt*, 866 A.2d at 324; *see also Pope*, 14 A.3d at 145-147.

_____

[10] We note that, under Rule 606(b), Juror Number 3 would not be competent to testify as to the contents of her personal, individual prayers, as those prayers would implicate her personal, mental processes in reaching the verdict.  *See* Pa.R.E. 606(b)(1) ("[d]uring an inquiry into the validity of a verdict, a juror may not testify about . . . any juror's mental processes concerning the verdict"); *see also State v. DeMille*, 756 P.2d 81, 84 (Utah 1988) ("[p]rayer is almost certainly a part of the personal decision-making process of many people, a process that is employed when serving on a jury. . . . [U]nder [Utah Rule of Evidence] 606(b), prayer and supposed responses to prayer are not included within the meaning of the words 'outside influence'"); *c.f. United States v. Brown*, 996 F.3d 1171, 1190 (11th Cir. 2021) (*en banc*) ("[j]urors may pray for and believe they have received divine guidance as they determine another person's innocence or guilt, a profound civic duty but a daunting task to say the least.  Prayer is a part of the personal decision-making process of many people, a process that is employed when serving on a jury.  To ask that jurors become fundamentally different people when they enter the jury room is at odds with the idea that the jury be drawn from a fair cross section of the community") (quotation marks and citations omitted).

In the case at bar, the issue of competency is muddied by the presence of Juror Number 3's Father and the extent of his involvement in Juror Number 3's prayer.  At this stage of the proceedings, there are no facts to establish the circumstances surrounding the prayer and whether Juror Number 3's Father subjected Juror Number 3 to extraneous information or outside

*(Footnote Continued Next Page)*

Order of November 22, 2021 denying the post-sentence motion vacated.

Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/7/2023

---

influence during the prayer. These are subjects that may properly be fleshed out during the evidentiary hearing.