J-A25020-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SHALINI SHENOY, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF VIJENDRA SHENOY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ALAN U. GLAZER, M.D., AKUMIN A/K/A AKUMIN, INC., AKUMIN CORP., AKUMIN HOLDINGS CORP., JEANES RADIOLOGY ASSOCIATES, LLC, (JEANES RADIOLOGY ASSOCIATES, P.C.), TRI-STATE IMAGING CONSULTANTS (TRI-STATE IMAGING CONSULTANTS, LLC, TRI-STATE IMAGING GROUP, LP, TRI-STATE IMAGING PARTNERS, LP, TRI-STATE IMAGING PR, LLC, TRI STATE IMAGING PARTNERS GP, LLC, TRI-STATE IMAGING PA HOLDINGS, LLC, TRI-STATE IMAGING INVESTMENTS LP, TRI-STATE IMAGING INVESTMENTS GP, LLC, TRI-STATE IMAGING SOLUTIONS, LLC) | : : : : : : : : : : : : : : : : : : : : | No. 3120 EDA 2024 |

Appeal from the Judgment Entered October 31, 2024
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2021-02498

BEFORE: LAZARUS, P.J., BOWES, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 10, 2026**

Shalini Shenoy ("Plaintiff"), individually and as executrix of the estate

of Vijendra Shenoy ("Decedent"), appeals from the judgment entered against

_____

[*] Retired Senior Judge assigned to the Superior Court.

her and in favor of Alan U. Glazer, M.D., upon a jury verdict in this action for medical malpractice.[1]  We affirm.

The underlying facts are as follows.  Decedent received a prescription from his oral surgeon for a CT scan "due to complaints of jaw pain and swelling."  Trial Court Opinion, 1/8/25, at 1.  Dr. Glazer was the radiologist who read the scan, which consisted of hundreds of images that captured not only Decedent's mouth and jaw area, but also parts of his head, neck, and upper chest.  *See* N.T. Trial (Vol. IV), 8/8/24, at 34-43.[2]  While he reported observing a nodule "representing a prominent lymph node" in portions of the

---

[1] Plaintiff also sued various business entities (hereafter "Corporate Defendants"), alleging that they were vicariously liable through *respondeat superior* for Dr. Glazer's purported negligence.  The jury's determination that Dr. Glazer was not negligent thus resolved her claims against the Corporate Defendants.  *See*, *e.g.*, *Mamalis v. Atlas Van Lines, Inc.*, 560 A.2d 1380, 1383 (Pa. 1989) ("[T]ermination of the claim against the agent extinguishes the derivative claim against the principal.  A claim of vicarious liability is inseparable from the claim against the agent since any cause of action is based on the acts of only one tortfeasor.").

[2] There are irregularities in the identification of the trial transcripts.  From the parties' briefs, we have determined that Volume III contains the notes of testimony from August 7, 2024, although it purports to be an additional volume for August 6.  Also, the transcript for the August 8, 2024 proceedings is not included in the certified record, but an excerpt of it containing Dr. Glazer's testimony is included in the reproduced record as Volume V.  Meanwhile, the certified record contains notes of testimony from August 12, 2024, also labeled as Volume V.  We refer to Volume III as reporting the August 7 proceedings, and deem the August 8 excerpt to be Volume IV, accepting the copy included in the reproduced record since there is no apparent dispute as to its accuracy.  *See* Pa.R.A.P. 1921, *Note*.

soft-tissue images of Decedent's chest, Dr. Glazer did not note any lesions there in his September 2017 report. **See** Trial Court Opinion, 1/8/25, at 1.

In 2019, upon seeking medical attention for chest pain, Decedent was diagnosed with a chondrosarcoma in his chest wall.[3] He sued Dr. Glazer for negligence, alleging that a suspicious 2.4 centimeter lesion had been visible on the 2017 CT scan and Dr. Glazer failed to report it. Decedent passed away while the litigation was pending, and Plaintiff amended the complaint to state survival and wrongful death claims, averring that the delayed diagnosis caused Decedent's demise.

Plaintiff's liability expert at trial was Marc Glickstein, M.D. Dr. Glickstein opined that the standard of care for a radiologist is to review every image included in the CT study in various types of windows, *i.e.* densities. **See** N.T. Trial (Vol. II), 8/6/24, at 29. While the radiologist should "look at the area that would be of interest for the scan," which in this instance was the parotid gland that produces saliva for the mouth, he should "also go back and look at all of the images again for other findings that may be present in different parts of the examination that was not the main focus of the study." **Id**. Dr.

---

[3] As one of Plaintiff's witnesses explained at trial, "chondrosarcomas are tumors [that] generally originate from the cartilage and tend to grow in areas that have heavy cartilage or bone." N.T. Trial, 8/6/24 (Vol. II), at 80. Further, "chondrosarcomas, like most sarcomas, are not really sensitive to chemotherapy and radiation." **Id**. Rather, "the only way to treat sarcomas in general and chondrosarcomas specifically for a good, long-term result is to completely remove it. So the earlier it is detected, the more likely you are to be able to remove it." **Id**. at 80-81.

Glickstein discerned that Dr. Glazer had done so, as he noted a nodule that was in the chest at the same level as the tumor which was ultimately discovered in 2019. Dr. Glickstein indicated that the "fairly large lesion" was visible on the 2017 images and was "not . . . particularly subtle[.]" *Id*. at 40. As such, he believed Dr. Glazer should have reported the lesion, and his failure to do so constituted negligence. *Id*. at 43-44.

On cross-examination, Dr. Glickstein conceded that the failure to appreciate or perceive an abnormality does not necessarily indicate a deviation from the standard of care. *Id*. at 45. He also acknowledged the existence of: (1) framing bias, which can make a doctor more alert to discern something he otherwise might not appreciate based upon who presented the study to him; and (2) hindsight bias, which may cause a radiologist to note something on imaging that he expects it to be present, knowing the patient's outcome. *Id*. at 45-46, 48. Dr. Glickstein recognized that practice parameters promulgated by the American College of Radiology, of which he was a member, suggested than an "expert witness should make every effort to avoid being influenced by hindsight and framing biases." *Id*. at 54. In that vein, the practice guidelines provide: "The expert witness should strive to minimize all potential sources of conscious and subconscious bias when reviewing case materials. Images and other relevant material presented in a blinded fashion to the expert in a malpractice lawsuit strengthens the credibility of the opinion rendered by the expert." *Id*. at 56.

Dr. Glickstein agreed that one way to avoid these biases is to employ blinding techniques, such as having a lawyer send multiple CT studies rather than the one at issue, or embedding the studies within the expert's clinical work so he is unaware that he is conducting a legal review. *Id.* at 49. Yet, while he had done blinded reviews in other cases, in the case *sub judice* he received Decedent's file "in a totally unblinded fashion." *Id*. at 50. Consequently, he (1) knew that a review of Decedent's CT images had been requested by an attorney, (2) reviewed the materials with access to information about the case that was unavailable to Dr. Glazer in 2017, and (3) authored a report that "focused on something [he] knew to be present based on . . . information derived after the fact[.]" *Id*. at 60.

Dr. Glazer was called to testify both in Plaintiff's case in chief and in his own defense. Overall, he agreed with Dr. Glickstein's testimony about the standard of care, but he maintained that he had satisfied it in reviewing Decedent's 2017 study. Specifically, Dr. Glazer attested that he possessed the knowledge and skill required of radiologists and kept current with developments within his specialty. *See* N.T. Trial (Vol. IV), 8/8/24, at 52-53. In reviewing Decedent's CT scans, Dr. Glazer went through every image of the study in its entirety in various windows, spending more time examining the images than was typical for him. *Id*. at 50; N.T. Trial (Vol. III), 8/7/24, at 42, 47. While he was retrospectively able to point out at trial part of a lesion visible at the bottom of the scan in the soft-tissue window, given the

information of Decedent's later imaging studies, Dr. Glazer simply did not appreciate the abnormality in 2017. ***See*** N.T. Trial (Vol. IV), 8/8/24, at 44-45. He suggested that the same framing bias that made the lesion so obvious to Dr. Glickstein in reviewing the study for Plaintiff's attorneys may account for his own failure to discern it when he examined the images for Decedent's oral surgeon:

> Well, the framing for this whole report and for the review of the study was for a right cheek lesion and a right cheek enlargement swelling. So[,] in my mind's eye, that's what I'm geared towards. So[,] although I reviewed the studies, the images, I didn't appreciate it at the time. I don't deny that it's there in retrospect.

***Id***. at 45.

In addition to offering the above testimony, both radiologists utilized the 2017 CT study in front of the jury at trial. As such, the jury was able to view the images and perceive how subtle or obvious the lesion appeared. The jury further heard causation and damages evidence from various expert and lay witnesses.

At the conclusion of trial, the jury found that Dr. Glazer was not negligent, obviating the need for it to make findings as to causation, damages, or the vicarious liability of the Corporate Defendants.

Plaintiff filed a post-trial motion seeking a new trial on the basis that the verdict was against the weight of the evidence. Plaintiff further contended that an investigation into possible juror improprieties was warranted based upon the following allegation:

[A] juror, who identified herself as a nurse[,] purportedly advised her fellow jurors that that she did not believe she would have seen the abnormality in the imaging study either (just as Dr. Glazer. . . missed it) and therefore his missing the abnormality in the study was not negligent, but rather just an acceptable mistake.

Motion for Post-Trial Relief, 8/22/24, at 3. After entertaining briefing by the parties and oral argument, the trial court denied Plaintiff's motion without a hearing.

This timely appeal followed the entry of judgment on the jury's verdict. The trial court ordered Plaintiff to file a Pa.R.A.P. 1925(b) statement, and she timely complied.[4] The trial court authored a responsive opinion in accordance with Rule 1925(a). Plaintiff presents two questions for our consideration:

1. Whether it was abuse of discretion to deny [Plaintiff]'s motion for a new trial where the jury's verdict was inadequate and manifestly against the weight of the evidence given that: it was uncontroverted that [Dr. Glazer] failed to identify a 2.4 cm tumor on a CT scan which continued to grow undetected for two years and ultimately led to [D]ecedent's death; [Plaintiff]'s experts testified that [Dr. Glazer] breached the standard of care by failing to note the tumor; [Dr. Glazer's] evidence to refute this was completely inadequate and no expert testimony regarding liability was produced at trial by the defense; and the jury's determination that [Dr. Glazer] was not negligent was so contrary to the evidence that it shocks one's sense of justice.

2. Whether it was abuse of discretion to deny [Plaintiff]'s motion to consider juror misconduct where there was a showing of improper influence on the jurors which caused them to fail to follow the trial court's instructions, to fail to apply the facts to the law, and to fail to be impartial. This showing was sufficient

_____

[4] We remind the trial court that all Rule 1925(b) orders must indicate the addresses to which the statement may be mailed and served by hand-delivery. *See* Pa.R.A.P. 1925(b)(3)(iii).

> to trigger a hearing to evaluate the alleged misconduct and to determine whether it likely prejudiced [Plaintiff].

Plaintiff's brief at 4-5.

We begin with the legal principles which govern Plaintiff's weight claim. "A verdict is against the weight of the evidence where certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Heffelfinger v. Shen*, 342 A.3d 711, 725 (Pa.Super. 2025) (cleaned up). "[I]n reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice." *Id*. (cleaned up).

It is well-settled that "[t]he decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court." *Id*. (cleaned up). The trial court's rejection of a weight challenge "is one of the least assailable reasons for denying a new trial." *Id*. (cleaned up). This Court's standard of review is not to evaluate the underlying weight claim, but to assess the trial court's exercise of discretion, and we "may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim." *Id*. (cleaned up). In this vein:

> The term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of

judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*In re M.B.*, 228 A.3d 555, 567 (Pa.Super. 2020) (cleaned up).

In the instant case, the trial court addressed Plaintiff's weight challenge by revisiting the testimony of Drs. Glickstein and Glazer and concluding that it presented the jury with an adequate basis to find for either side. Citing Dr. Glickstein's concessions that "the standard of care for a radiologist does not require perfection and the fact that an abnormality was not appreciated or perceived by a radiologist does not necessarily mean the radiologist was negligent[,]" the court opined that "[t]he jury was not required to accept Dr. Glickstein's opinion that Dr. Glazer violated the standard of care." Trial Court Opinion, 1/8/25, at 6-7 (cleaned up). Since the jury thus could have reasonably rejected Dr. Glickstein's opinion as to negligence, and instead embraced Dr. Glazer's testimony that he conducted a competent review, the court's conscience was not shocked by the verdict. *Id*. at 7.

Plaintiff argues that her evidence compellingly demonstrated, and the defense failed to controvert, that Dr. Glazer breached his duty of care to Decedent by not identifying and reporting the lesion in 2017. She contends that Dr. Glazer's self-serving testimony, plus the specter of possible framing or hindsight bias on the part of Dr. Glickstein, "was so vague, nebulous[,] and deficient" a defense "that it 'shocks the conscience' to receive a verdict that found Dr. Glazer not negligent." Plaintiff's brief at 45.

Plaintiff posits that this Court's decision in **Vallone v. Creech**, 820 A.2d 760 (Pa.Super. 2003), illustrates her right to relief. In that case, a cancer patient who had a breast lumpectomy in 1991 presented to the defendant doctor in October 1996, complaining of pain and changes in the shape of her breast. The doctor informed her that the changes were most likely due to radiation therapy and advised her to follow up every three months. By the time the doctor ordered a biopsy and confirmed the recurrence of the cancer fourteen months later, the patient had to have a double mastectomy and undergo chemotherapy to treat it, drastically decreasing her chance of surviving more than five years.

The patient's experts opined that the failure to order a biopsy when the patient first presented fell below the standard of care, given her history of cancer and the changes in her breast. The defense expert testified that the doctor complied with the standard of care because there was no need to order a biopsy at that point. However, the defendant doctor admitted in his trial testimony that, at the time the patient first presented, "he believed there was a 20% chance the cancer had recurred, yet he did nothing to confirm that suspicion until approximately [fourteen] months later." **Id**. at 763 (emphasis omitted).

The jury nonetheless returned a verdict for the doctor, and the patient moved for a new trial. The trial court granted the motion, having deemed the defense verdict shocking to its conscience. It explained:

> [I]t is clear beyond reasonable dispute that failure of [the doctor] to order a biopsy of [the patient's] right breast for approximately fifteen months after first noting changes in it that he admitted could have been cancerous substantially increased [her] risk of harm, and decreased her chances of surviving five more years (the standard definition of cancer cure) from perhaps 90% to zero.

*Id*. at 764 (cleaned up).  Given the doctor's conscious decision not to act upon a perceived substantial chance that the patient's cancer had returned, the trial court concluded that "there was no rational explanation for the jury verdict in this case."  *Id*. at 762 (cleaned up).  The doctor appealed the trial court's exercise of discretion in awarding the new trial, but we declined to grant relief, deeming the court's assessment of the evidence to be apt.

Dr. Glazer argues that the facts of *Vallone* are materially distinguishable from the circumstances of the instant appeal.  He explains:

> Here, unlike [in] *Vallone*, no evidence was presented at trial that Dr. Glazer appreciated the lesion on the CT and disregarded it in 2017 when he originally reviewed the images.  On the contrary, Dr. Glazer testified he did not appreciate the lesion at that time despite performing a thorough review of the CT films, and spending adequate time reviewing the films.  Plaintiff's own expert admitted that the fact that an abnormality was not appreciated or perceived by a radiologist does not necessarily mean the radiologist was negligent.

Dr. Glazer's brief at 31.  We agree.

Critically, the *Vallone* Court was presented with an appeal from the trial court's decision to grant, not deny, a new trial upon finding merit in the weight claim.  The doctor-appellant in that case failed to meet his considerable burden of convincing us that the ruling was an abuse of the trial court's discretion, and we therefore affirmed the trial court's ruling.  In asking us to reverse the

- 11 -

trial court's ruling in the instant case, Plaintiff's invocation of **Vallone** unsuitably speaks to the underlying question of whether the verdict was shocking, rather than whether the trial court's exercise of discretion was founded upon "reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions." **In re M.B.**, 228 A.3d at 567 (cleaned up).

We find no such defect in the trial court's denial of Plaintiff's request for a new trial in this case. First, we note that there was no suggestion that Dr. Glazer lacked the training and experience necessary to review Decedent's CT images, employed inappropriate techniques in doing so, or chose not to report any abnormality that he in fact had observed. Instead, as our recitation above indicates, Plaintiff's case wholly rested upon the jury accepting Dr. Glickstein's opinion that the appearance of the lesion was so obvious that Dr. Glazer's failure to recognize it amounted to negligence.

To counter that theory, the defense elicited testimony that, while the abnormality may have been obvious when viewed through hindsight and framing biases, it was subtle enough that Dr. Glazer's failure to observe and report it was not a deviation from the standard of care. The jury hence had a rational basis to discredit Dr. Glickstein's opinion that the failure to appreciate and communicate it amounted to negligence, concluding instead that Dr. Glazer had not been perfect, but had operated within the bounds of reasonable care.

Consequently, the trial court's conclusion that the verdict was not conscience-shocking because the evidence was sufficient for the jury to find for either side was founded upon reason and supported by the record, and thus, was not an abuse of discretion. Therefore, Plaintiff's weight claim merits no relief. **See Heffelfinger**, 342 A.3d at 725 ("An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim." (cleaned up)).

Plaintiff's remaining question involves the trial court's refusal to hold a hearing on her allegations of juror misconduct, namely that "the foreperson and other nurse juror provided 'expert-like' opinions to the jury." Plaintiff's brief at 61. The trial court ruled that Plaintiff had no right to develop her claim at a hearing because "it was based solely on evidence of interactions among the jurors themselves and not by exposure to any extraneous or outside information." Trial Court Opinion, 1/8/25, at 10.

Plaintiff again presents us with an issue subject to review for an abuse of discretion. **See Pratt v. St. Christopher's Hosp.**, 866 A.2d 313, 324 (Pa. 2005) ("The procedure for development of such claims and their ultimate disposition remain vested, in the first instance, within the sound discretion of the trial courts.").

The competency of a juror to testify as a witness during an inquiry into the validity of a verdict is governed by Pa.R.E. 606, which in pertinent part states:

(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) *Exceptions*. A juror may testify about whether:

(A) prejudicial information not of record and beyond common knowledge and experience was improperly brought to the jury's attention; or

(B) an outside influence was improperly brought to bear on any juror.

Pa.R.E. 606(b). The official comment to the rule elucidates that exception (2)(A) "is directed at evidence brought before the jury which was not presented during the trial, and which was not tested by the processes of the adversary system and subjected to judicial screening for a determination of admissibility." Pa.R.E. 606, *Comment*. "The qualification of 'common knowledge and experience' is a recognition that all jurors bring with them some common facts of life." *Id*.

This Court recently reiterated that, "under the exceptions to the no-impeachment rule, a juror may testify only as to the existence of the extraneous information or outside influence, but not as to the effect this may have had on deliberations. Under no circumstances may jurors testify about their subjective reasoning processes." *Commonwealth v. Hall*, 345 A.3d 332, 336 (Pa.Super. 2025) (cleaned up). Rather, upon proof that the jury was exposed to outside information or influence, the court applies an objective

test to ascertain whether it prejudiced the verdict. ***See Pratt***, 866 A.2d at 322 ("Since inquiry into the actual, subjective mental processes of the jurors is not permitted, the limited-scope, objective inquiry furnishes the most reasonable methodology for evaluating the impact of extraneous information and outside influence.").

For example, ***Pratt*** was a medical malpractice action founded upon a doctor's failure to timely diagnose an infection, with the plaintiffs asserting that a CAT scan should have been ordered by the doctor earlier. Two weeks after the jury reached a defense verdict, one of the jurors sent a letter to the trial judge "indicating that, during deliberations, she had learned from several other jurors that they had discussed the case with outside medical professionals, who were friends, relatives and/or personal physicians." ***Id***. at 314–15. The court provided the letter to counsel, and the plaintiffs sought post-trial relief *nunc pro tunc* raising the question of "whether a hearing and/or a new trial was warranted on account of the allegation of taint relative to the jury deliberations." ***Id***. at 315. The trial court denied the motion, concluding that, while the juror was not foreclosed from testifying about extraneous information brought to bear on deliberations, her "letter did not contain a sufficient indication of prejudice to warrant a hearing or new trial." ***Id***. at 316.

This Court reversed and remanded for a hearing, and our Supreme Court affirmed that order:

> As the Superior Court concluded, the circumstances of the present case squarely implicate the extraneous-information exception, since [the plaintiffs] alleged inappropriate contact with outside medical professionals. Furthermore, it is not controverted that the asserted, improper communications pertained to a central, disputed issue in the case, namely, the applicable medical standard of care and, more specifically, whether a CAT scan was implicated at an early stage of the medical evaluation of [the plaintiffs'] son. The Superior Court therefore correctly held that juror testimony was not foreclosed concerning whether or not the alleged communications occurred, regarding their range and content, and as to whether they were in fact injected into the jury deliberations.

*Id*. at 321 (citations omitted).

Our High Court further agreed that the trial court abused its discretion in declining "to hear juror testimony and evaluate it according to the objective test for prejudice[,]" observing that the trial court's rationale "essentially would put verdicts beyond effective reach, even in instances in which jury deliberations are alleged to have been tainted by outside sources. Such irregularities, however, are verifiable without undue inquiry into the actual deliberative processes of jurors." *Id*. at 321-22. Therefore, the case went back to the trial court for it to conduct a hearing regarding the accuracy of the juror's allegations, "the character and extent of any information conveyed, and whether recipients were majority or minority jurors[.]" *Id*. at 324.

Hence, *Pratt* establishes that an evidentiary hearing is warranted in the face of allegations that jury deliberations may have been influenced by outside information, beyond common knowledge or experience, on a central issue in the case. *Accord Commonwealth v. Jeter*, 296 A.3d 1187 (Pa.Super. 2023)

- 16 -

(holding trial court abused its discretion in denying a request for an evidentiary hearing where a party alleged that one of the jurors had talked about the case with her father during jury deliberations because she was having difficulty deciding how to vote, and she ultimately voted guilty as a result of the discussions).

On the other hand, this Court affirmed the denial of an evidentiary hearing in *Hall*.[5]  There, Hall was convicted of repeatedly raping his daughter in the house where they lived with Hall's wife and two other children.  He did not testify in his defense or offer other family members as fact or character witnesses.  He sought a post-trial "evidentiary hearing predicated on a proffer that, at his trial, the jury foreperson made statements during the deliberation process to other jurors that purportedly indicated [that Hall] had a prior criminal record."  *Hall*, 345 A.3d at 334.  More particularly, the foreperson, who was an attorney, allegedly "either suggested or implied that if someone doesn't call a character witness in their defense in a jury trial, that means they have prior criminal convictions." *Id*. at 337 (cleaned up).  Significantly, "Hall's counsel did not suggest that the jury violated the sequestration rules by doing outside research, but rather utilized external information outside the realm of what is typically possessed by a layperson." *Id*. (cleaned up).

_____

[5] The *Hall* decision was published after the parties filed their briefs.  Plaintiff filed an application for supplemental briefing to address *Hall*, but withdrew her request before we ruled upon it.

While Hall maintained that these circumstances were akin to those that warranted a hearing in **Pratt**, we disagreed:

> **Pratt** is eminently distinguishable to the present matter because it involved jurors, while empaneled in a medical malpractice case, having discussions with outside medical professionals, who were friends, relatives, and/or personal physicians. More recently, in **Jeter**, a decision where this Court found a partial abuse of discretion and remanded for an evidentiary hearing, there had been an allegation that, during jury deliberations, one of the jurors, *inter alia*, was having a difficult time deciding what to do and discussed the case with her father, resulting in an ultimate decision to vote guilty. We determined that the prejudice threshold had been met to warrant further investigation to determine whether that juror's father provided the juror with prejudicial information not of record and beyond common knowledge and experience or improperly brought to bear an outside influence on her.
>
> Here, juxtaposed against his concession that none of the jurors performed outside research prior to reaching their collective verdict, Hall's argument necessarily stems from the preexisting knowledge or supposition of an attorney juror. Despite this contention, even assuming that there was a communication from the foreperson to at least one other juror that resembles Hall's proffer, he has failed to provide any indication, or citation to authority, that the juror's statement was anything more than speculation on that juror's behalf. Without anything to corroborate the juror's effective hunch that the absence of character witnesses suggested a prior criminal record, there was no prejudicial information or outside influence within their respective evidentiary meanings.

**Hall**, 345 A.3d at 337-38 (cleaned up).

Furthermore, we held that Hall failed to establish that the alleged extraneous information was beyond common knowledge and experience, since Hall "presented no authority to establish that the inclusion or omission of character witnesses, and the attendant effects of those decisions, falls

- 18 -

squarely within the exclusive domain of an attorney's capacity for understanding, and falls outside the ken of laypersons and/or lay jurors." *Id*. at 338 (citation omitted).

Accordingly, the *Hall* Court ruled "that the proffered testimony merely delved into the deliberative process, which may not be reached." *Id*. Moreover, "although the attorney foreperson may have conveyed to one or more jurors that Hall's trial strategy was possibly purposeful based on a potential criminal record, it was not predicated on objective, outside **information** that was beyond common knowledge and experience." *Id*. (emphasis in original). Accordingly, we affirmed the trial court's decision.

In the instant case, Plaintiff maintains that "all the factors needed to trigger a hearing to investigate jury improprieties are present here." Plaintiff's brief at 62. She asserts that the alleged improper statements related to a central issue in the case. While she acknowledges that there is no indication that any independent research was conducted, she argues:

> [T]he scenario presented in this case is more prejudicial than the one presented in *Pratt* where the jurors spoke with outside friends and family who were involved in the medical profession: here, the information came from within the jury room from jurors who were themselves involved in the medical profession. Thus, the source of the extraneous information was sitting and arguing in the jury room, unlike with the *Pratt* jurors. Practically speaking, it would be very hard for a juror who was not a medical professional to argue against the foreperson who said she, as a nurse, would not have seen the tumor on a CT scan and therefore Dr. Glazer's failure to see it was not negligence. The influence on the jury on a crucial component of the negligence claim—whether Dr. Glazer's failure to see the tumor was a breach of the standard

of care—from an overly confident medical professional on the jury likely tainted the jury's deliberations.

***Id***. at 62-63.

If Plaintiff had alleged that a juror consulted with other doctors or authorities that indicated Dr. Glazer's failure to notice Decedent's lesion had been an acceptable error within the standard of care, we would agree that she was entitled to a hearing in accordance with ***Pratt*** and the cases from other jurisdictions upon which she relies. ***See*** Plaintiff's brief at 58-61 (citing cases in which jurors did independent research to inform their decisions).[6] Yet, that is not the scenario presented in this appeal.

What is before this Court is far more analogous to the situation in ***Hall***. Here, as in ***Hall***, a juror offered an opinion on the evidence that was grounded in the juror's professional experience. The alleged statement reflected the juror's personal assessment of the trial record, not "objective, outside **information** that was beyond common knowledge and experience." ***Hall***, 345 A.3d at 338 (emphasis in original). Just as each ***Hall*** juror may have notions as to the reason for the defense's decision not to call character witnesses, here each member of the jury saw Decedent's CT images during

---

[6] Plaintiff additionally cites a case involving a prospective juror's expertise on an issue in the case rather than outside research. ***See*** Plaintiff's brief at 60-61 (citing ***Mach v. Stewart***, 137 F.3d 630 (9th Cir. 1997)). However, that case involved whether the court should have granted a mistrial based upon the potential taint of the jury pool who overheard the *voir dire* of the prospective juror conducted on the record in court, not an intrusion into jury deliberations that is governed by Pa.R.E. 606.

trial and could ponder whether he or she would have noticed it. The statement of one juror that she would not have seen it does not constitute prejudicial outside information beyond the ken of laypersons improperly brought to the jury's attention, such that the juror could testify about it in accordance with Pa.R.E. 606(b)(2). Rather, the evidence proffered by Plaintiff concerns the juror's opinion of the trial evidence and her "mental processes concerning the verdict."[7] Pa.R.E. 606(b)(1). Rule 606(b)(1) precludes Plaintiff from calling the juror to testify about the statements. Hence, the trial court did not err in denying her request for a hearing.

For these reasons, Plaintiff has failed to persuade us that the trial court abused its discretion in denying her post-trial relief on either of her issues. Therefore, we affirm.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/10/2026

---

[7] To the extent that other jurors may have been more inclined to be persuaded by this juror because she was a medical professional, that concern was addressable during the jury selection process through for-cause or peremptory challenges. *Accord Hall*, at 345 A.3d at 338 n.3 (observing that "a possible way of staving off complaints associated with jurors" whose training may impact the deliberations process is to not put them on the jury in the first place).